# EXHIBIT 1

Electronically Filed
4/21/2024 8:15 PM
Steven D. Grierson
CLERK OF THE COURT

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
**THE702FIRM INJURY ATTORNEYS**
8335 West Flamingo Road
Las Vegas, Nevada 89147
Telephone:     (702) 776-3333
Facsimile:     (702) 505-9787
***E-Mail:***     *mckteam@the702firm.com*
*Attorneys for Plaintiff*

CASE NO: A-24-891601-C
Department 23

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| CATELYN H., pseudonymously,<br><br>    Plaintiff,<br><br>vs.<br><br>G6 HOSPITALITY, LLC,<br>WYNDHAM HOTEL & RESORTS, INC.,<br>LAS VEGAS SANDS CORP.,<br>BOYD GAMING CORP.,<br>MGM RESORTS INTERNATIONAL,<br>HARD ROCK INTERNATIONAL (USA), INC.<br>JOHN DOE CORPS. 1–9,<br><br>    Defendants. | Case No. :<br>Dept. No. :<br><br>**COMPLAINT**<br>**HUMAN TRAFFICKING**<br>**under NRS § 41.13965,**<br>**NRS § 41.1399, and**<br>**18 U.S.C. § 1595**<br><br>**EXEMPT FROM ARBITRATION:**<br>**Exemption Claimed:**<br>**Probable Jury Award Exceeds $50,000**<br><br>**JURY DEMAND** |

Plaintiff CATELYN H., by and through her attorneys, MICHAEL C. KANE, ESQ., and BRADLEY J. MYERS, ESQ., of THE702FIRM, states follows:

**PARTIES**

1.     Plaintiff CATELYN H. ("**Catelyn**") is a natural person residing in Clark County, Nevada.

2.     Due to the sensitive and intimate nature of the issues in this case, Plaintiff asks the Court to enter a protective order under Nevada Rule of Civil Procedure 26(c): (1) permitting her to proceed under the pseudonym "Catelyn H."; and (2) forbidding the parties from disclosing her identity to third parties without either her consent or the prior approval of the Court.

3.     John Doe Corp Nos. 1 and 2 are the entities that owned or operated the former Hacienda Hotel, and John Doe Corp. No. 3 is their successor-in-interest or a company that assumed their liabilities.  The hotel was located at 525 N Sepulveda, El Segundo, United States, 90245.

**THE702FIRM**
**ATTORNEYS AT LAW**
**8335 West Flamingo Road**
**LAS VEGAS, NEVADA 89147**
**PHONE: (702) 776-3333**

1

4.    Defendant Wyndham Hotel Resorts, Inc. ("**Wyndham**") franchised the Ramada Limited, which was located at 4300 W Century Blvd. Inglewood, CA 90304. In addition to franchising the Ramada Limited, Defendant Wyndham controlled the Ramada Limited in ways that give rise to liability, as described in this Complaint. The location has changed to another brand since Plaintiff's trafficking.

5.    John Doe Corp. Nos. 4–5 are entities that were franchisees or otherwise participated in the operation of the Ramada Limited, and Jone Doe Corp. No. 6 is their successor-in-interest or is a company that assumed their liabilities.

6.    Defendant G6 Hospitality, LLC ("**G6**") franchised the Motel 6 described below, and is a Delaware corporation. In addition to franchising the Motel 6, G6 Hospitality controlled the Motel 6 in ways that give rise to liability, as described in this Complaint.

7.    John Doe Corp. Nos. 7–8 are entities that owned or operated the Motel 6 at 5101 W. Century Blvd, Inglewood, CA 90304, and John Doe Corp. No. 9 is their successor-in-interest or is a company that assumed their liabilities.

8.    Defendant LAS VEGAS SANDS CORP. ("**Sands**") is a Nevada corporation. On reference, Sands owned and operated the Venetian Resort Las Vegas ("the Venetian") and the Palazzo at the Venetian Resort ("the Palazzo").

9.    Defendant Boyd Gaming Corporation ("**Boyd**") is a Nevada corporation based in Paradise, Nevada. It owned and operated The Cannery Casino & Hotel (the "Cannery") located at 2121 E Craig Rd, North Las Vegas, NV 89030 at all relevant times.

10.    Defendant MGM RESORTS INTERNATIONAL ("**MGM**") is a Delaware corporation. It owned and operated The Mirage Hotel & Casino (the "Mirage") at the relevant times.

11.    Defendant Hard Rock International (USA), Inc. ("**Hard Rock**") bought The Mirage and, on information and belief, assumed its liabilities.

12.    Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to this action.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

2

**INTRODUCTION**

Sin City

13.    From Prohibition to the present day, Las Vegas has long had a special reputation for catering to visitors' more disreputable tastes in ways no other city will.

14.    By the 1950s, Las Vegas was famous for catering to male vice, especially in the forms of gambling and prostitution. "Sin City," as Vegas would soon be known, cultivated its image as *the* place for men to get away and enjoy themselves, free from the burdens of their families and the judgment of their communities.

15.    Although prostitution had technically been illegal in Clark County since 1931, easy access to commercial sex remained key part of the city's allure for many male visitors.

16.    This was only possible because Vegas happily tolerated a nominally illegal yet nearly omnipresent commercial sex sector. As late as the mid-1950s, the Clark County Sheriff still tolerated a brothel operating openly just a few miles off the Strip. Even after the last openly acknowledged Clark County brothels closed, commercial sex in Vegas remained a matter of police concern only when its consequences spilled over to people not involved in the industry.

17.    Vegas's casinos openly welcomed, played into, and benefitted from Vegas's sexualized image. For decades, the standard cover motif of *Fabulous Las Vegas*—the City's premier entertainment publication—was a scantily clad woman posing next to a swanky casino.

18.    Worse, Vegas casinos have long invited a discreet and sanitized segment of the city's extensive sex trade onto their gaming floors and into their guest rooms.

19.    As David Schwartz, Director of the Center for Gaming Research at UNLV puts it when discussing the 1950s, Vegas's casinos created a hierarchy of sex work that, "mirrors in many ways the socioeconomic world of the Strip. For high rollers, the select pit girls were available, much like comped rooms and other luxuries. For less well-connected players, the cocktail lounge prostitutes provided a similar service within the casino resort. Finally, for those who either had little money or whose predilections, violent or otherwise, could not be satisfied by the 'call girls' of the casino, streetwalkers represented the bottom of Las Vegas's prostitution hierarchy." SCHWARTZ, DAVID, SUBURBAN XANADU 61 (2013).

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

3

20.    This system of illegal yet openly tolerated prostitution greatly benefited the casinos because it ensured their male guests could always find the commercial sex that was one of Vegas's main draws, while at the same time it "kept the actual casino operators' involvement with prostitution to a minimum. At the most, casino managers would introduce high rollers to 'clean' prostitutes who would not attempt to rob or blackmail the player." *Id.*

21.    At the same time, the technical illegality of prostitution meant, "the casino[s] could have a free hand in ejecting 'undesirable' prostitutes from the premises." *Id.*

22.    Over the subsequent decades, shifting social mores and a push to broaden Vegas's appeal led casinos to demand greater discretion from the sex workers they invite in.

23.    But even today, the hierarchy the casinos pioneered decades ago remains largely intact:    A "clean" prostitute who doesn't make trouble is welcome in any casino on the Strip because they and their employees know cracking down on the trade would put them at a disadvantage versus more "tolerant" competitors.  And recent research shows casino employees still frequently earn generous kickbacks for connecting guests to sex workers.

24.    The casinos also continue to broadcast obvious hints about the sexual services available to their guests.  Perhaps the best example of this is the world-famous slogan: "What Happens Here, Stays Here" (a/k/a "What Happens in Vegas, Stays in Vegas").

25.    Created in 2003 under the aegis of the casino-dominated Las Vegas Convention and Visitors Authority ("LVCVA"), the slogan is intentionally ambiguous.  Its creators' stated goal was to remind viewers that Vegas has more to offer than gambling, while leaving the details to their imaginations.  But given Vegas's longstanding reputation, everyone involved must have known it would be interpreted by many as a thinly veiled promise to tolerate sex tourism.

26.    Certainly, that's how UNLV sociology professor Barb Brents, who studies Nevada's sex industry, interprets it. *See* Lopez, Sandy, *Prostitution in Nevada has its advantages, experts say*, LAS VEGAS REVIEW-JOURNAL (July 7, 2016), www.reviewjournal.com/local/local-las-vegas/downtown/prostitution-in-nevada-has-its-advantages-experts-say/.

27.    So, when Vegas's casinos authorized and funded these ambiguous-yet-risqué ads for over 15 years (through 2018), they knew the promise they were making and did it anyway.

What Happens in Vegas

28.    Contrary to the comfortable myth spread by those who benefit from prostitution, there is no clean distinction between "consensual prostitution" and sex trafficking.

29.    Today, Nevada retains its status as the "symbolic center of the commercial sex industry."  Heineman, Jennifer et al., *Sex Industry and Sex Workers in Nevada*, SOCIAL HEALTH OF NEVADA, 1 (2012), *available at* digitalscholarship.unlv.edu/social_health_nevada_reports/48.

30.    It is no coincidence that Nevada is also the State with the second-highest rate of human trafficking. *Human Trafficking Statistics by State 2024*, WORLD POPULATION REVIEW (last accessed Jan. 15, 2024), *available at* https://worldpopulationreview.com/state-rankings/human-trafficking-statistics-by-state.

31.    The FBI calls Las Vegas one of 13 "High Intensity Child Prostitution Areas."  *Non-Cyber Sexual Exploitation of Children*, OFFICE OF THE INSPECTOR GENERAL (Jan. 2009), *available at* https://oig.justice.gov/reports/FBI/a0908/chapter4.htm#122.

32.    Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves.  Figures vary, but most studies find half or more of prostitutes work under the control of a pimp.  *See* Williamson, Celia and Clouse-Tolar, Terry, *Pimp-Controlled Prostitution, Still an Integral Part of Street Life*, VIOLENCE AGAINST WOMEN, Vol. 8 No. 9, 1074–1092, at 1074 (Sept. 2002) (citing studies giving figures as high as 80%).

33.    Catelyn spent years under the control of her traffickers.  During that time, the pimps who controlled her threatened her, beat her, raped her, forced her to have sex with strange men, took all or nearly all her earnings, held onto some or all of her identification documents, controlled her access to basic needs like food and housing, and had her watched at all times.

34.    Catelyn's victimization began at age fifteen, after she ran away from home and found herself desperate enough to accept a strange man's offer of shelter and protection.  She never wanted to be a sex worker, but the choice—and her childhood—were taken from her.

35.    Sadly, Catelyn's story is far from unique.  In fact, nearly all pimp-controlled prostitutes—and so likely a majority of all prostitutes—are the victims of coercion.

36.   For a start, it is standard practice for pimps to take all or nearly all of the money earned by the women and girls they control. The pimps then use the money to pay for their victims' needs only as and when it suits them. This creates total dependence, both practical and psychological, on the pimp. *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html.

37.   In addition to total financial dependence, pimps control their victims through a mixture of other means that varies from pimp to pimp. Physical violence is a common component. *See* Williams & Clouse-Tolar (2002), at 1085 ("The extent to which women felt threatened by a pimp was, in part, a function of her evaluation of the likelihood that he will become physically violent. This threat had been realized by all of the women in the study.")

38.   Other common components include renting victims' housing in the pimp's name, retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps, and threatening to separate victims from their children if they disobey or try to leave.

39.   As a result, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences. On reference and belief, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

40.   All Defendants know or should know these basic facts about the nature of the sex trade that they welcome into their properties. At the very least, all must be aware that some significant proportion of the prostitutes whom they permit their guests to patronize—and permit their employees to assist guests in patronizing—are, in fact, human trafficking victims.

41.   To the extent that they claim not to know *which* prostitutes are victims and which are working for themselves, Defendants can make that claim only because they have taken steps to avoid finding out.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

**BACKGROUND**

42.     Catelyn's mother was an alcoholic who abused Catelyn both physically and emotionally.

43.     Around 2003, when Catelyn was 15 years old, she and a younger cousin ran away from home together.

44.     Initially, they planned to flee to Catelyn's grandmother's house.  As they were walking, a stranger driving by stopped and gave them a ride there.

45.     The stranger's name was Steve,[1] but he usually went by "2Ps."  Steve gave Catelyn his number on the ride and offered to let her stay in his hotel room if things didn't work out.

46.     When Catelyn and her cousin arrived, her grandmother was not able to take her in and provide for her.

47.     Catelyn had nowhere to turn, so she called Steve.

48.     Steve picked Catelyn and her cousin up and took them to a hotel room where he staying with several other girls.

49.     Steve told Catelyn and her cousin that at least one of them would need engage in sex work to make money, or else the other girls would make him kick them out.

50.     Catelyn's little cousin was 13 years old and a virgin, so Catelyn reluctantly agreed to engage in sex work so that her cousin would not have to.

51.     The first time Catelyn was with a "john," she was so disgusted that she threw up all over the man while attempting to put a condom on him.

52.     From that day on, Catelyn found herself trapped in a cycle of sex work.  She came under control of number of different traffickers who trafficked her in California hotels and motels.

53.     In March or April of 2004, Catelyn came under the control of a single trafficker—Laron Darrell Carter, also known by the alias "Birdd," spelled with two "d's" to signify "a double dose of pimpin'."

54.     Birdd was known in the pimping business for having more women than other pimps.  For each one of the Defendants, an obvious red flag that Birdd was a pimp was that he

---

[1] Plaintiff does not know "2Ps" real name, but she believes it may have been Steve Applehead.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

would walk everywhere with at least three—and usually six or seven—scantily clad women dressed for sex work surrounding him.

55. Birdd was a member of a group of six pimps who referred to themselves as "Gardena's Finest." Birdd was the informal leader of the group, and two of the other members were his brothers. The remaining three members—including Catelyn's first trafficker Steve—were friends of the brothers.

56. Almost Catelyn's first introduction to Birdd was watching Steve, Birdd, and the rest of Gardena's finest beating and stomping on a woman for trying to change which pimp she worked for within the group. The group beat the woman bloody, and Catelyn never learned what happened to her afterward.

57. Birdd was frequently physically abusive both to Catelyn and to other members of his "stable" of girls. Beatings were handed out an average of once a week, and they could be triggered by anything from escape attempts to simple requests for better living conditions.

58. From 2004 to 2006, while Catelyn was still a minor, Birdd trafficked her continuously, mostly in California and Arizona hotels and motels.

59. Catelyn appeared young. Even now, in her mid-thirties, people think Catelyn must be 21. When Catelyn was a minor, even when she was 17, she looked like she could have been 12 years old.

60. In 2006, when Catelyn turned 18, she was already pregnant with Birdd's child.

61. After Catelyn had Birdd's child at the hospital, Birdd forced Catelyn to check out of the hospital early, against her doctors' wishes, to return to sex work and make money.

62. From 2006 to 2012, Birdd continued to traffic Catelyn, and he increasingly trafficked her in Las Vegas.

63. In 2012, Birdd was arrested, but he was released within months—in other words, before Catelyn could arrange for her life to be free of his influence.

64. After Birdd was released, he began doing everything he could to make Catelyn's life hell to coerce her to return to her old life. Between Birdd's stalking and his weaponization of the child he'd forced her to bear, Catelyn felt she had no choice but to return to him.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

8

65. Only in 2014 was Birdd finally arrested for the FBI on multiple sex trafficking and transportation of minors charges.

66. After Birdd's arrest, Catelyn was finally able to start digging out the hooks Birdd had sunk into her mind and into her life, but the process took several more months.

**TRAFFICKING AS A CHILD**

67. Between the ages of fifteen and seventeen, Catelyn was trafficked in numerous hotels in and around Los Angeles California. Three in particular stand out for the frequency with which she was trafficked in them and the number of red flags their employees and management witnessed.

The Hacienda Hotel

68. The hotel where Birdd and his girls, including Catelyn, stayed most often was the Hacienda Hotel, located at 525 N Sepulveda, El Segundo, United States, 90245.

69. While Catelyn was still a minor, Birdd and his girls used this hotel as something of a home base, staying in it for as much as a month at a time.

70. Sex workers like Birdd's girls made up a significant percentage of the Hacienda Hote's clientele, to a degree that it would have been impossible for any employee or manager to miss.

71. Catelyn and Birdd's other girls performed "in calls" at the Hacienda Hotel. An "in call" is when a customer or "trick" comes to the location where a sex worker is staying in order to meet up for commercial sex.

72. Birdd or one of his experienced girls would arrange the in calls by posting advertisements on Backpage, Craigslist, and Sugar Daddy using the Hacienda Hotel's Wifi.

73. In total, Catelyn alone performed at least tens and likely hundreds of in calls at the Hacienda Hotel as a minor, even though its reputation made many tricks unwilling to go there.

74. When staying in the Hacienda Hotel, Birdd and his "stable"—which usually comprised between seven and eleven girls—would rent just two or three rooms for the entire group.

75. When checking in and all throughout their stays, the girls were always dressed for sex work in high heels and fishnet dresses.

**THE702FIRM**
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

9

76. Birdd administered beatings at the Hacienda Hotel on average once a week. Catelyn can remember security coming to their rooms once or twice as a result, but neither Birdd nor his victims were ever kicked out.

77. Throughout each of Birdd's stable's stays at the Hacienda Hotel, they frequently asked for fresh changes of linens and left behind large numbers of used condoms in the trash.

78. The staff of the Hacienda Hotel thus could not have missed that Birdd was a pimp and that his girls were sex workers, nor could they have missed that Catelyn and several other girls were underage.

### The Motel 6

79. Another frequent haunt of Birdd and his girls was the Motel 6 located at 5101 W. Century Blvd, Inglewood, CA 90304.

80. While Catelyn was still a minor, she stayed at the Motel 6 with Birdd—or at times with a subset of his girls—for a total of about two months.

81. Sex workers like Birdd's girls made up a significant percentage of the Motel 6's clientele, to a degree that it would have been impossible for any employee or manager to miss.

82. Catelyn and Birdd's other girls performed "in calls" at the Motel 6. During a normal stay at the Motel 6, Catelyn would see about ten tricks per day, and all of Birdd's girls staying there taken together would see about thirty tricks per day.

83. The guest rooms at the Motel 6 can only be reached by going through the lobby, so the staff at the Motel 6 would have seen each of these men enter, stay for only a few minutes, and depart again the same way.

84. Birdd or one of his experienced girls would arrange the in calls by posting advertisements on Backpage, Craigslist, and Sugar Daddy using the Motel 6's Wifi.

85. In total, Catelyn alone performed hundreds of in calls at the Motel 6.

86. During each stay Birdd and his "stable," or whatever subset thereof he had sent to the Motel 6, would sleep three or more to a room.

87. When checking in and all throughout their stays, the girls were always dressed for sex work in high heels and fishnet dresses.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

88. As was his habit elsewhere, Birdd likely administered several beatings at the Motel 6 during the two months Catelyn stayed there as a minor.

89. When staying at the Motel 6, Birdd and his girls regularly asked for fresh linens and always left behind huge numbers of used condoms.

90. The staff of the Motel 6 thus could not have missed that Birdd was a pimp and that his girls were sex workers, nor could they have missed that Catelyn and several other girls were underage.

The Ramada Limited

91. Another frequent haunt of Birdd and his girls was the Ramada Limited located at 4300 W Century Blvd. Inglewood, CA 90304.

92. While Catelyn was still a minor, she stayed at the Ramada Limited with Birdd—or at times with a subset of his girls—for a total of about one month.

93. Sex workers like Birdd's girls made up a significant percentage of the Ramada's clientele, to a degree that it would have been impossible for any employee or manager to miss.

94. In fact, "the blade"—meaning the street known to locals as the place where streetwalking prostitutes ply their trade—was right there in front of the Ramada Limited.

95. While staying at the Ramada Limited, Catelyn and Birdd's other girls were often made to "walk the blade," meaning to walk up and down the street in front of the hotel wearing extremely revealing clothing that advertised their availability for commercial sex.

96. The Ramada Limited did not have a lobby, but rather had a check-in window facing the blade, from which the hotel's front desk employees watched Catelyn and the other girls pick up tricks and bring them back to their hotel rooms for commercial sex.

97. They would have seen this happen at least tens of times for Catelyn, specifically, and hundreds of times for Birdd's girls taken together.

98. Catelyn and Birdd's other girls also performed "in calls" at the Ramada Limited. During a normal stay at the Ramada Limited, Catelyn would see about ten tricks per day (counting both in calls and tricks brought back from the blade), while all of Birdd's girls staying there would together see about thirty tricks per day.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

99.    Birdd or one of his experienced girls would arrange the in calls by posting advertisements on Backpage, Craigslist, and Sugar Daddy using the Ramada Limited's Wifi.

100.    During each stay Birdd and his "stable," or whatever subset thereof he had sent to the Ramada Limited, would sleep three or more to a room.

101.    When checking in and all throughout their stays, the girls were always dressed for sex work in high heels and fishnet dresses.

102.    As was his habit elsewhere, Birdd likely administered several beatings at the Ramada Limited during the month Catelyn stayed there as a minor.

103.    When staying at the Ramada Limited, Birdd and his girls regularly asked for fresh linens and always left behind huge numbers of used condoms.

104.    The staff of the Ramada Limited thus could not have missed that Birdd was a pimp and that his girls were sex workers, nor could they have missed that Catelyn and several other girls were underage

### TRAFFICKING AS AN ADULT

105.    After Catelyn turned 18, Birdd continued to traffic her in many of the same hotels for years longer.  As Catelyn grew older, however, Birdd began taking her to Las Vegas more and more frequently, until eventually Catelyn became effectively settled in Las Vegas.

106.    Although Catelyn temporarily escaped from Birdd's control as a result of his 2012 arrest, Birdd managed to retake control of her life in late 2013 by applying unrelenting pressure through stalking and threatening to withhold their child.

107.    Between late 2013 and late 2014, Birdd coerced Catelyn into resuming sex work in various Las Vegas casinos, four of which stand out for the frequency with which they permitted their guests to pay Catelyn for sex work and for their generally welcoming attitude to the sex trade.

### The Planet Hollywood[2]

108.    During Catelyn's victimization in 2013 and 2014, she walked the carpets and picked up tricks in the Planet Hollywood Las Vegas Resort & Casino more than a dozen times.

---

[2] No entity affiliated with the Planet Hollywood is named as a defendant because Plaintiff's claims against it were likely discharged in the Caesars Entertainment, Inc. bankruptcy.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

109.   Even compared to other Las Vegas casinos, the Planet Hollywood was notoriously tolerant of sex work. Catelyn felt comfortable walking the carpet there because she did not constantly have to worry that being too obvious about her trade would draw the wrong kind of attention.

110.   During the entire course of her trafficking, Catelyn visited the Planet Hollywood so often that she got to know the bartenders at several bars, including the Heart Bar and the Halo Bar, as well as other Planet Hollywood employees.

111.   Between her dress, her frequent visits, her demeanor, and her habit of going upstairs with other guests after only brief conversations, these bartenders and other employees could not have failed to recognize that Catelyn was performing sex work.

112.   Because these employees were also, by the nature of their work, reasonably familiar with the sex trade, they would likely have recognized the signs that Catelyn was a pimp-controlled, and thus coerced, prostitute.

113.   Nevertheless, these employees and the Planet Hollywood as a whole continued to welcome Catelyn in to walk the carpet even as late as her final period of active trafficking during 2013–2014.

The Mirage

114.   During 2013–2014, Catelyn walked the carpet inside The Mirage Las Vegas and picked up tricks three or four times.

115.   Catelyn had visited The Mirage far more frequently prior to 2012, and she therefore was or should have been familiar to its employees and particularly its security staff.

116.   Like the Planet Hollywood, the Mirage was notoriously tolerant of sex work. Catelyn felt comfortable walking the carpet there because she did not constantly have to worry that being too obvious about her trade would draw the wrong kind of attention.

117.   Between her dress, her frequent visits, her demeanor, and her habit of going upstairs with other guests after only brief conversations, these bartenders and other employees could not have failed to recognize that Catelyn was performing sex work.

118.    Because these employees were also, by the nature of their work, reasonably familiar with the sex trade, they would likely have recognized the signs that Catelyn was a pimp-controlled, and thus coerced, prostitute.

119.    Nevertheless, these employees and the Mirage as a whole continued to welcome Catelyn in to walk the carpet even as late as her final period of active trafficking during 2013–2014.

The Palazzo at the Venetian Resort

120.    During Catelyn's victimization in 2013 and 2014, she walked the carpets and picked up tricks in the Palazzo at the Venetian Resort more than a dozen times.

121.    Even compared to other Las Vegas casinos, the Palazzo was notoriously tolerant of sex work.  Catelyn felt comfortable walking the carpet there because she did not constantly have to worry that being too obvious about her trade would draw the wrong kind of attention.

122.    The Palazzo's clientele was also particularly rife with men hoping to patronize sex workers.

123.    During the entire course of her trafficking, Catelyn visited the Palazzo so often that she would have been known to numerous of its employees and managers.

124.    Between her dress, her frequent visits, her demeanor, and her habit of going upstairs with other guests after only brief conversations, these bartenders and other employees could not have failed to recognize that Catelyn was performing sex work.

125.    Because these employees were also, by the nature of their work, reasonably familiar with the sex trade, they would likely have recognized the signs that Catelyn was a pimp-controlled, and thus coerced, prostitute.

126.    Nevertheless, these employees and the Palazzo as a whole continued to welcome Catelyn in to walk the carpet even as late as her final period of active trafficking during 2013–2014.

The Cannery

127.    During 2013–2014, Catelyn walked the carpet inside The Cannery Casino & Hotel and picked up tricks three or four times.

128. Catelyn had visited The Cannery far more frequently prior to 2012, and she therefore was familiar to its employees and particularly its security staff.

129. In particular, Catelyn was well known to one Cannery employee who worked as a dealer during the 2013–2014 period.

130. This employee knew both Catelyn and her trafficker Birdd, and he was fully aware of the abusive and coercive nature of Birdd's control over Catelyn.

131. Nevertheless, the employee repeatedly assisted the Cannery's guests in patronizing Catelyn, including by bringing potentially lucrative tricks to Catelyn's attention, including on several occasions during 2013–2014.

132. Between her dress, her frequent visits, her demeanor, and her habit of going upstairs with other guests after only brief conversations, the Cannery's other employees could not have failed to recognize that Catelyn was performing sex work.

133. Because these employees were also, by the nature of their work, reasonably familiar with the sex trade, they would likely have recognized the signs that Catelyn was a pimp-controlled, and thus coerced, prostitute.

134. Nevertheless, these employees and the Cannery as a whole continued to welcome Catelyn in to walk the carpet even as late as her final period of active trafficking during 2013–2014.

<u>The Casino Defendants' Surveillance</u>

135. On information and belief, Defendants Sands, Boyd, MGM, and Hard Rock (hereinafter the "Casino Defendants") used sophisticated facial recognition software, with which they monitored their properties' omnipresent security cameras, particularly at casino entrances.

136. One major purpose of this facial recognition software was to assist their security staff in turning away persons the Casino Defendants considered undesirable.

137. It did this by flagging such persons wherever they were spotted in the casinos and alerting security personnel.

138. On information and belief, the Casino Defendants' facial recognition software was able to (and did) recognize and flag Catelyn as a suspiciously frequent visitor to each casino.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

15

139. On information and belief, the Casino Defendants' security employees ignored the flag on Catelyn because they understood Casino Defendants' policy that only undesirable or disruptive sex workers should be singled out, and then only to be turned away or ejected.

140. On information and belief, security personnel at each casino became aware on multiple occasions that Catelyn was visiting (or had just visited) their casino for the purpose of engaging in commercial sex.

141. Additionally, because the Casino Defendants' security employees were perforce more familiar with the sex industry than an average member of the public, they would have been aware that many, or even most, prostitutes are underage or are victims of coercion.

142. Thus, on information and belief, the employees knew Catelyn was being trafficked.

143. Nevertheless, the employees turned a blind eye to Catelyn's plight because to do otherwise would have inconvenienced the employees and potentially upset her clients (and the casinos' guests) who often came to Las Vegas for its reputation for tolerating commercial sex.

144. On information and belief, this willful blindness was intentionally fostered by the Casino Defendants in order to please their clientele and so pad their bottom lines.

145. Additionally, this willful blindness was likely encouraged by Defendants' desire to draw a sharp line between acceptable "consensual prostitution" and human trafficking that in a way that places nearly all prostitutes on the "consensual" side of the line.

146. On information and belief, to the extent that Defendants gave their employees any training on recognizing human trafficking, that training strongly emphasized the idea that most prostitution is consensual, and thus that employees should only take action (or report to their superiors) if they witnessed clear direct evidence of severe physical abuse.

### CATELYN'S ONGOING SUFFERING

147. After she escaped, Catelyn couldn't believe that anyone would take a story like hers seriously, let alone that she could have a chance at justice.

148. This mental block was built and strengthened by her experiences and the words of other girls she met in "the game," all of which had taught her that no one cared what happened to sex workers.

149.    Catelyn's traffickers intentionally fostered Catelyn's belief that even women like her who had been forced into sex work as children were undeserving of justice—and that nobody would ever take them seriously.

150.    The Casino Defendants also created a climate in the Las Vegas area of disregarding and trivializing the suffering of sex workers, in particular by consistently characterizing sex workers as criminals and themselves as the real victims.

151.    It wasn't late 2023 that Catelyn saw the advertisement that broke through and let her conceptualize herself as a victim so that she was finally able to bring herself to speak to an attorney about what had happened to her.

### G6'S CONTROL OVER THE MOTEL 6

152.    G6 employees work throughout the Motel 6 by G6. G6 employees work jobs including front desk and housekeeping. G6 is the principal with control over nearly every element of operations at the Motel 6 by G6. G6 is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Motel 6 by G6 where Plaintiff was trafficked. G6 has an actual and apparent agency relationship with the physical property owner of the Motel 6 by G6 as to establish vicarious liability.

153.    G6 controlled and dictated the actions and inactions of the Motel 6 by G6 through highly specific and detailed brand standards, policies, and procedures.

154.    G6 knowingly benefited, or received something of value, from its commercial business venture at the Motel 6 by G6 through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where Plaintiff was trafficked, as well as in maintaining a positive public image for the Motel 6 brand.

155.    G6 exercises day-to-day control over the Motel 6 and its other brand hotels through centralized corporate systems, training, policies, and brand standards. G6 implements and retains brand hotel control over, including control over the Motel 6, as either direct subsidiaries or under the terms of its franchise agreements.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

17

156. G6 controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

   a. Requiring the branded locations to use G6's centralized property management, data management, and reservation and billing systems;

   b. Gathering reports of data generated by branded locations including guest information, reservation, payment, and occupancy information through G6's centralized systems;

   c. Conducting regular quality assurance inspections and audits for compliance with franchise agreement terms and G6's rules and regulations;

   d. Requiring brands to purchase products through G6's e-procurement marketplace system or from approved suppliers;

   e. Requiring branded properties to pay fees based of the percentage of gross room revenues;

   f. Providing advertising requirements and standardized marketing services for the branded locations;

   g. Requiring branded hotels to use approved vendors for internet services or other requirements for cybersecurity and technology;

   h. Requiring all fixtures, furnishings, equipment, signs, services, materials, and supplies to meet G6's strict standards and specifications;

   i. Regulating employment policies at branded location including training and orientation materials for staff;

   j. Requiring branded locations to make modifications to the branded properties upon G6's request and to refrain from make substantial changes to the branded property without G6's permission;

   k. Regulating the rates for room rentals;

   l. Controlling training and other policies related to human trafficking and prostitution; and

   m. Insurance coverage requirements.

157. G6 jointly employs all staff located the Motel 6 by G6 where Plaintiff was trafficked.

158. G6 manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by G6.

159. G6 controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on G6's website, and mentions across its corporate media channels.

160. G6 requires branded properties to use a centralized, cloud-based reservation and property management system.

161. G6 gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.

162. G6 requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives G6 the ability to access, monitor, and harvest that internet data.

163. G6 requires branded properties to comply with its corporate policies relating to Safety and Security, Codes of Conduct, Ethics, Economic, Social, Governance, and compliance with the law.

### WYNDHAM'S CONTROL OVER THE RAMADA LIMITED

164. Wyndham exercises day-to-day control over the Ramada and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Wyndham implements and retains brand hotel control over, including control over Ramada, as either direct subsidiaries or under the terms of its franchise agreements.

165. Upon information and belief, Wyndham controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations to use Wyndham's property management system;

b. Requiring branded locations to keep audit reports and other records;

c. Conducting regular inspections, quality assurance evaluation reports, and audits for compliance with franchise agreement terms and Wyndham's corporate policies;

d. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Wyndham's centralized systems;

e. Requiring the brands to regularly report data regarding customer feedback to Wyndham;

f. Providing marketing requirements and standardized marketing services for the branded locations;

g. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

h. Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access, security, filtering;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Wyndham's request and to refrain from make substantial changes to the branded property without Wyndham's permission;

k. Requiring branded properties to comply with Wyndham's Human Rights Policy and other laws;

l. Regulating the rates for room rentals; and

m. Insurance coverage requirements.

166. Wyndham jointly employs all staff located at the Ramada where Plaintiff was trafficked.

167. Wyndham manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Wyndham.

168. Wyndham controls uniform and required reservation, marketing, customer support systems and royalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Wyndham's website, and mentions across its corporate media channels

169. Through its national sales team, Wyndham controls the credit processing system and the centralized direct billing at its brand hotels, including the Ramada.

170. Wyndham mandates branded properties source through Wyndham's global distribution system.

171. In addition, through an integrated corporate marketplace, Wyndham mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Ramada.

172. Wyndham regulates property rate, inventory availability, and overall revenue management for the branded locations by monitoring hotel booking data for trends and patterns.

173. Wyndham manages its branded properties through its Oracle Hospitality OPERA Cloud Property Management System.

174. Wyndham's Development and Sourcing teams negotiate contracts on behalf of brands for hotel infrastructure, operating supplies and equipment and food and beverage.

175. Wyndham controls and provides centralized technology systems for hotel operations at its brand hotels, including systems its brand hotels must use to access shared customer data and reservations information. Wyndham also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Ramada.

176. Wyndham is the employer of the staff at its branded properties. For example, Wyndham posts all hotel jobs on its parent website.

177. Wyndham is also responsible for setting the core values and culture for all Wyndham employees.

178. In addition, Wyndham sets forth policies for, and provides employee benefits.

179. Wyndham first adopted a Human Rights Statement in 2007. According to the updated 2018 policy, Wyndham promises to comply with human rights laws and standards and has "accountability mechanisms" in place to monitor and report on compliance.

180. Brand locations are required to comply with human rights and "operating standards." Failure to comply can result in the termination of the franchise agreement.

### COUNT I: 18 U.S.C. § 1595 ("TVPRA")

181. Plaintiff incorporates each foregoing and subsequent allegation.

182. Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

183. Through their acts and omissions described above, Defendants are "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a)(1 & 2), as they harbored her while being reckless with regard to a substantial risk that she was being trafficked (and in some cases was also underage).

184. Through their acts and omissions described above, Defendants subject to liability as beneficiaries of trafficking under 18 U.S.C. § 1595. Each Defendant participated in a commercial venture, such as the running of a hotel, motel, or casino, and each Defendant was negligent and reckless with regard to whether the venture was benefitting from Plaintiff's trafficking.

185. Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

///

**COUNT II: 18 U.S.C. § 2255(A), CHILD ABUSE VICTIMS' RIGHTS ACT ("CAVRA")**

186. Plaintiff incorporates herein each foregoing and subsequent allegation.

187. Plaintiff was a "minor" pursuant to 18 U.S.C. § 2255(a) when she was trafficked.

188. Plaintiff was the "victim" of violations of 18 U.S.C. § 1591.

189. Plaintiff suffered "personal injury" pursuant to 18 U.S.C. § 2255(a) as a result of those violations.

190. Through their actions described above, Defendants are "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a)(1 & 2), and they are thus subject to direct liability under 18 U.S.C. § 2255.

191. Through their actions described above, Defendants are also subject to beneficiary liability under 18 U.S.C. § 2255.

192. Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' properties.

**COUNT III: NRS 41.1399**

193. Plaintiff incorporates each foregoing and subsequent allegation.

194. Plaintiff is a victim of human trafficking in the meaning of N.R.S. 41.1399(10)(a).

195. Through their actions described above, Defendants were responsible for Plaintiff's trafficking within the meaning of N.R.S. 41.1399(1).

196. Through their actions described above, Defendants profited from Plaintiff's trafficking within the meaning of N.R.S. 41.1399(1).

197. Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under N.R.S. 41.1399.

**COUNT IV: NRS 41.13965**

198. Plaintiff incorporates herein each foregoing and subsequent allegation.

199. Defendants knowingly benefited, financially or by receiving anything of tangible value, from participation in a venture which they knew or should have known has engaged in the sexual abuse and exploitation of Plaintiff, who they knew or should have known was underage.

200. Defendants are liable for knowingly assisting and gaining a benefit from the sexual abuse and exploitation of Plaintiff, and they are thus liable to Plaintiff for treble damages.

201. To the extent a Defendant is an establishment with more than 175 rooms available, that Defendant still benefited from, upon information and belief, increased foot traffic in its establishment; increased gambling revenues; ATM fees; kickbacks from third parties for selling the Internet and Wi-Fi usage data of johns and pimps; the sale of intoxicating liquors used in the sex trafficking industry.

### COUNT V: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

202. Plaintiff incorporates each foregoing and subsequent allegation.

203. Defendants' intentional acts and omissions, as described above, were extreme and outrageous to the point of being intolerable in a civilized society.

204. Plaintiff suffered severe emotional distress and permanent psychological injuries as a result of Defendants' intentional acts and omissions, and she is therefore entitled to damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

    **a.** Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

    **b.** Disgorgement of profits and/or restitution;

    **c.** Punitive damages, attorneys' fees, and expenses;

    **d.** The costs of this action;

    **e.** Pre- and post-judgment interest; and

    **f.** Any other relief the Court or jury deems appropriate.

///

///

///

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

DATED this 21st day of April, 2024.

THE702FIRM

/S/ MICHAEL KANE

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
8335 West Flamingo Road
Las Vegas, Nevada  89147

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice forthcoming*)
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

*Attorneys for Plaintiff Catelyn D.*

## DEMAND FOR JURY TRIAL

Plaintiff Catelyn D., by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED this 21st day of April, 2024.

THE702FIRM

/S/ MICHAEL KANE

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
8335 West Flamingo Road
Las Vegas, Nevada  89147

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice forthcoming*)
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

*Attorneys for Plaintiff Catelyn D.*

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

25