MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
**THE702FIRM INJURY ATTORNEYS**
8335 West Flamingo Road
Las Vegas, Nevada 89147
Telephone:    (702) 776-3333
Facsimile:    (702) 505-9787
*E-Mail:*    *service@the702firm.com*

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice*)
**HILTON PARKER LLC**
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068
Telephone:    (614) 992-2277
Facsimile:    (614) 927-5980
*E-Mail:*    *gparker@hiltonparker.com*

## DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| CATELYN H., pseudonymously,<br><br>       Plaintiff,<br>vs.<br><br>VENETIAN GAMING LAS VEGAS, LLC,<br>BOYD GAMING CORP., and<br>THE MIRAGE CASINO-HOTEL, LLC,<br><br>       Defendants. | Case No. : 2:24-cv-939<br><br>Judge James C. Mahan<br>Mag. Judge Daniel J. Albregts<br><br>**FIRST<br>AMENDED COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff CATELYN H., by and through her attorneys, MICHAEL C. KANE, ESQ., BRADLEY J. MYERS, ESQ. and JOEL S. HENGSTLER, ESQ. of THE702FIRM, and GEOFFREY C. PARKER, ESQ. of HILTON PARKER LLC, states follows:

**PARTIES**

1.      Plaintiff Catelyn H. ("**Catelyn**") is a natural person residing in Nevada.

2.      Due to the sensitive and intimate nature of the issues in this case, Plaintiff asks the Court to enter a protective order under Nevada Rule of Civil Procedure 26(c): (1) permitting her to proceed under the pseudonym "Catelyn H."; and (2) forbidding the parties from disclosing her identity to third parties without either her consent or the prior approval of the Court.

3. Defendant Venetian Gaming Las Vegas, LLC ("**VGLV**") is a Nevada corporation with its principal place of business in Paradise, Nevada.

4. VGLV owned and operated the Venetian Resort Las Vegas ("the Venetian"), located at 3355 S Las Vegas Blvd, Las Vegas, NV 89109, as well as the Palazzo at the Venetian Resort ("the Palazzo"), located at 3325 S Las Vegas Blvd., at all relevant times.

5. Defendant Boyd Gaming Corporation ("**Boyd**") is a Nevada corporation with its principal place of business in Paradise, Nevada.

6. Boyd owned and operated The Cannery Casino & Hotel ("the Cannery") located at 2121 E Craig Rd, North Las Vegas, NV 89030 at all relevant times.

7. Defendant The Mirage Casino-Hotel, LLC ("**MCH**") is a Nevada company with its principal place of business in Paradise, Nevada.

8. MCH owned and operated The Mirage Hotel & Casino (the "Mirage") located at 3400 S Las Vegas Blvd, Las Vegas, NV 89109 at all relevant times.

9. Defendants acted through their agents, employees, officers, members, directors, heirs, successors, assigns, principles, trustees, sureties, subrogees, representatives, and insurers at all times relevant to this action.

INTRODUCTION

Sin City

10. From Prohibition to the present day, Las Vegas has long had a special reputation for catering to visitors' more disreputable tastes in ways no other city will.

11. By the 1950s, Las Vegas was famous for catering to male vice, especially in the forms of gambling and prostitution. "Sin City," as Vegas would soon be known, cultivated its image as *the* place for men to get away and enjoy themselves, free from the burdens of their families and the judgment of their communities.

12. Although prostitution had technically been illegal in Clark County since 1931, easy access to commercial sex remained key part of the city's allure for many male visitors.

13. This was only possible because Vegas happily tolerated a nominally illegal yet nearly omnipresent commercial sex sector. As late as the mid-1950s, the Clark County Sheriff

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

still tolerated a brothel operating openly just a few miles off the Strip.  Even after the last openly acknowledged Clark County brothels closed, commercial sex in Vegas remained a matter of police concern only when its consequences spilled over to people not involved in the industry.

14.    Vegas's casinos openly welcomed, played into, and benefitted from Vegas's sexualized image.  For decades, the standard cover motif of *Fabulous Las Vegas*—the City's premier entertainment publication—was a scantily clad woman posing next to a swanky casino.

15.    Worse, Vegas casinos have long invited a discreet and sanitized segment of the city's extensive sex trade onto their gaming floors and into their guest rooms.

16.    As David Schwartz, Director of the Center for Gaming Research at UNLV puts it when discussing the 1950s, Vegas's casinos created a hierarchy of sex work that, "mirrors in many ways the socioeconomic world of the Strip. For high rollers, the select pit girls were available, much like comped rooms and other luxuries. For less well-connected players, the cocktail lounge prostitutes provided a similar service within the casino resort. Finally, for those who either had little money or whose predilections, violent or otherwise, could not be satisfied by the 'call girls' of the casino, streetwalkers represented the bottom of Las Vegas's prostitution hierarchy." SCHWARTZ, DAVID, SUBURBAN XANADU 61 (2013).

17.    This system of illegal yet openly tolerated prostitution greatly benefited the casinos because it ensured their male guests could always find the commercial sex that was one of Vegas's main draws, while at the same time it "kept the actual casino operators' involvement with prostitution to a minimum. At the most, casino managers would introduce high rollers to 'clean' prostitutes who would not attempt to rob or blackmail the player." *Id.*

18.    At the same time, the technical illegality of prostitution meant, "the casino[s] could have a free hand in ejecting 'undesirable' prostitutes from the premises." *Id.*

19.    Over the subsequent decades, shifting social mores and a push to broaden Vegas's appeal led casinos to demand greater discretion from the sex workers they invite in.

20.    But even today, the hierarchy the casinos pioneered decades ago remains largely intact:  A "clean" prostitute who doesn't make trouble is welcome in any casino on the Strip because they and their employees know cracking down on the trade would put them at a

disadvantage versus more "tolerant" competitors. And recent research shows casino employees still frequently earn generous kickbacks for connecting guests to sex workers.

21. The casinos also continue to broadcast obvious hints about the sexual services available to their guests. Perhaps the best example of this is the world-famous slogan: "What Happens Here, Stays Here" (a/k/a "What Happens in Vegas, Stays in Vegas").

22. Created in 2003 under the aegis of the casino-dominated Las Vegas Convention and Visitors Authority ("LVCVA"), the slogan is intentionally ambiguous. Its creators' stated goal was to remind viewers that Vegas has more to offer than gambling, while leaving the details to their imaginations. But given Vegas's longstanding reputation, everyone involved must have known it would be interpreted by many as a thinly veiled promise to tolerate sex tourism.

23. Certainly, that's how UNLV sociology professor Barb Brents, who studies Nevada's sex industry, interprets it. *See* Lopez, Sandy, *Prostitution in Nevada has its advantages, experts say*, LAS VEGAS REVIEW-JOURNAL (July 7, 2016), www.reviewjournal.com/ local/local-las-vegas/downtown/prostitution-in-nevada-has-its-advantages-experts-say/.

24. So, when Vegas's casinos authorized and funded these ambiguous-yet-risqué ads for over 15 years (through 2018), they knew the promise they were making and did it anyway.

<u>What Happens in Vegas</u>

25. Contrary to the comfortable myth spread by those who benefit from prostitution, there is no clean distinction between "consensual prostitution" and sex trafficking.

26. Today, Nevada retains its status as the "symbolic center of the commercial sex industry." Heineman, Jennifer et al., *Sex Industry and Sex Workers in Nevada*, SOCIAL HEALTH OF NEVADA, 1 (2012), *available at* digitalscholarship.unlv.edu/social_health_nevada_reports/48.

27. It is no coincidence that Nevada is also the State with the second-highest rate of human trafficking. *Human Trafficking Statistics by State 2024*, WORLD POPULATION REVIEW (last accessed Jan. 15, 2024), *available at* https://worldpopulationreview.com/state-rankings/ human-trafficking-statistics-by-state.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

28.     The FBI calls Las Vegas one of 13 "High Intensity Child Prostitution Areas." *Non-Cyber Sexual Exploitation of Children*, OFFICE OF THE INSPECTOR GENERAL (Jan. 2009), *available at* https://oig.justice.gov/reports/FBI/a0908/chapter4.htm#122.

29.     Regardless of how they got into the sex trade, most women who work as prostitutes are not working for themselves. Figures vary, but most studies find half or more of prostitutes work under the control of a pimp. *See* Williamson, Celia and Clouse-Tolar, Terry, *Pimp-Controlled Prostitution, Still an Integral Part of Street Life*, VIOLENCE AGAINST WOMEN, Vol. 8 No. 9, 1074–1092, at 1074 (Sept. 2002) (citing studies giving figures as high as 80%).

30.     Catelyn spent years under the control of her traffickers. During that time, the pimps who controlled her threatened her, beat her, raped her, forced her to have sex with strange men, took all or nearly all her earnings, held onto some or all of her identification documents, controlled her access to basic needs like food and housing, and had her watched at all times.

31.     Catelyn's victimization began at age fifteen, after she ran away from home and found herself desperate enough to accept a strange man's offer of shelter and protection. She never wanted to be a sex worker, but the choice—and her childhood—were taken from her.

32.     Sadly, Catelyn's story is far from unique. In fact, nearly all pimp-controlled prostitutes—and so likely a majority of all prostitutes—are the victims of coercion.

33.     For a start, it is standard practice for pimps to take all or nearly all of the money earned by the women and girls they control. The pimps then use the money to pay for their victims' needs only as and when it suits them. This creates total dependence, both practical and psychological, on the pimp. *See* Johnson, Matthew and Dank, Meredith, *The Hustle: Economics of the Underground Commercial Sex Industry*, URBAN INSTITUTE (2014), *available at* https://apps.urban.org/features/theHustle/index.html.

34.     In addition to total financial dependence, pimps control their victims through a mixture of other means that varies from pimp to pimp. Physical violence is a common component. *See* Williams & Clouse-Tolar (2002), at 1085 ("The extent to which women felt threatened by a pimp was, in part, a function of her evaluation of the likelihood that he will become physically violent. This threat had been realized by all of the women in the study.")

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

35. Other common components include renting victims' housing in the pimp's name, retaining control of victims' identification documents, telling stories about the horrible fates suffered by girls who disobeyed other pimps, and threatening to separate victims from their children if they disobey or try to leave.

36. As a result, very few prostitutes who find themselves answering to a pimp feel able to leave without suffering some disastrous combination of physical, emotional, reputational, and financial consequences. On reference and belief, for more than half of all prostitutes these potential consequences rise to the level of "serious harm" as defined in 18 U.S.C. § 1591(e)(5).

37. All Defendants know or should know these basic facts about the nature of the sex trade that they welcome into their properties. At the very least, all must be aware that some significant proportion of the prostitutes whom they permit their guests to patronize—and permit their employees to assist guests in patronizing—are, in fact, human trafficking victims.

38. To the extent that they claim not to know *which* prostitutes are victims and which are working for themselves, Defendants can make that claim only because they have taken steps to avoid finding out.

BACKGROUND

39. Catelyn's mother was an alcoholic who abused Catelyn both physically and emotionally.

40. Around 2003, when Catelyn was 15 years old, she and a younger cousin ran away from home together.

41. Initially, they planned to flee to Catelyn's grandmother's house. As they were walking, a stranger driving by stopped and gave them a ride there.

42. The stranger's name was Steve,[1] but he usually went by "2Ps." Steve gave Catelyn his number on the ride and offered to let her stay in his hotel room if things didn't work out.

43. When Catelyn and her cousin arrived, her grandmother was not able to take her in and provide for her.

44. Catelyn had nowhere to turn, so she called Steve.

---

[1] Plaintiff does not know "2Ps" real name, but she believes it may have been Steve Applehead.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

45.     Steve picked Catelyn and her cousin up and took them to a hotel room where he staying with several other girls.

46.     Steve told Catelyn and her cousin that at least one of them would need engage in sex work to make money, or else his other girls would make him kick Catelyn and her cousin out.

47.     Catelyn's little cousin was 13 years old and a virgin, so Catelyn reluctantly agreed to engage in sex work so that her cousin would not have to.

48.     The first time Catelyn was with a "john," she was so disgusted that she threw up all over the man while attempting to put a condom on him.

49.     From that day on, Catelyn found herself trapped in a cycle of sex work.  She came under control of number of different traffickers who trafficked her in California hotels and motels.

50.     In March or April of 2004, Catelyn came under the control of a single trafficker—Laron Darrell Carter, also known by the alias "Birdd," spelled with two "d's" to signify "a double dose of pimpin'."

51.     Birdd was known in the pimping business for controlling more women than other pimps.  For each one of the Hotel Defendants, an obvious red flag that Birdd was a pimp was that he would walk everywhere with at least three—and usually six or seven—scantily clad women dressed for sex work surrounding him.

52.     Birdd was a member of a group of six pimps who referred to themselves as "Gardena's Finest."  Birdd was the informal leader of the group, and two of the other members were his brothers.   The remaining three members—including Catelyn's first trafficker Steve—were friends of the brothers.

53.     Almost Catelyn's first introduction to Birdd was watching Steve, Birdd, and the rest of Gardena's finest beating and stomping on a woman for trying to change which pimp she worked for within the group.  The group beat the woman bloody, and Catelyn never learned what happened to her afterward.

54.     Birdd was frequently physically abusive both to Catelyn and to other members of his "stable" of girls.  Beatings were handed out an average of once a week, and they could be triggered by anything from escape attempts to simple requests for better living conditions.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

7

55. From 2004 to 2006, while Catelyn was still a minor, Birdd trafficked her continuously, mostly in California and Arizona hotels and motels.

56. Catelyn appeared young. Even now, in her mid-thirties, people think Catelyn must be 21. When Catelyn was a minor, even when she was 17, she looked like she could have been 12 years old.

57. In 2006, when Catelyn turned 18, she was already pregnant with Birdd's child.

58. After Catelyn had Birdd's child at the hospital, Birdd forced Catelyn to check out of the hospital early, against her doctors' wishes, to return to sex work and make money.

59. From 2006 to 2012, Birdd continued to traffic Catelyn. During this period he increasingly trafficked her in Las Vegas.

60. In 2012, Birdd was arrested, but he was released within months—in other words, before Catelyn could arrange for her life to be free of his influence.

61. After Birdd was released, he began doing everything he could to make Catelyn's life hell to coerce her to return to her old life. For example, he showed up outside her home wielding weapons on multiple occasions, he hid recording devices in her car and behind her couch, and he used the child he had forced her to bear as leverage. Between Birdd's stalking, his threats, and his weaponization of her child, Catelyn felt she had no choice but to work for him again.

62. Only in 2014 was Birdd finally arrested by the FBI on multiple charges related to sex trafficking and transportation of minors.

63. After Birdd's arrest, Catelyn was finally able to start digging out the hooks Birdd had sunk into her mind and into her life.

64. Unfortunately, the process took several more months after his arrest. During those months, Catelyn continued to work for Birdd, mostly by walking the carpets in the same Las Vegas casinos she had frequented before his arrest.

65. Birdd's ability to control Catelyn from behind bars resulted from of a decade of psychological abuse and conditioning that began when Catelyn was just sixteen. His hold was strengthened by his continued ability to weaponize her child, and from her knowledge that he had been arrested before and had still managed to secure release and force his way back into her life.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

66.    Between late 2013 and late 2014, Birdd coerced Catelyn into commercial sex work in various Las Vegas casinos, three of which stand out for the frequency with which they permitted their guests to pay Catelyn for sex work and for their generally welcoming attitude to the sex trade.

### The Mirage

67.    During 2013–2014, Catelyn walked the carpet inside The Mirage Las Vegas and picked up tricks there three or four times.

68.    Catelyn had visited The Mirage far more frequently prior to 2012, and she therefore was or should have been familiar to its employees and particularly its security staff.

69.    The Mirage was notoriously tolerant of sex work. Catelyn felt comfortable walking the carpet there because she did not constantly have to worry that being too obvious about her trade would draw the wrong kind of attention.

70.    Between her dress, her frequent visits, her demeanor, and her habit of going upstairs with male guests after only brief conversations, MCH's employees could not have failed to recognize that Catelyn was performing sex work.

71.    Because these employees were also, by the nature of their work, reasonably familiar with the sex trade, they would likely have recognized the signs that Catelyn was a pimp-controlled, and thus coerced, prostitute.

72.    Nevertheless, these employees and the Mirage as a whole continued to welcome Catelyn in to walk the carpet even as late as her final period of active trafficking during 2013–2014.

### The Palazzo at the Venetian Resort

73.    During Catelyn's victimization in 2013 and 2014, she walked the carpets and picked up tricks in the Palazzo at the Venetian Resort more than a dozen times.

74.    Even compared to other Las Vegas casinos, the Palazzo was notoriously tolerant of sex work. Catelyn felt comfortable walking the carpet there because she did not constantly have to worry that being too obvious about her trade would draw the wrong kind of attention.

75.    The Palazzo's clientele was also particularly rife with men hoping to patronize sex workers.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

76.    During the entire course of her trafficking, Catelyn visited the Palazzo so often that she would have been known to numerous of its employees and managers.

77.    Between her dress, her frequent visits, her demeanor, and her habit of going upstairs with other guests after only brief conversations, VGLV's employees could not have failed to recognize that Catelyn was performing sex work.

78.    Because these employees were also, by the nature of their work, reasonably familiar with the sex trade, they would likely have recognized the signs that Catelyn was a pimp-controlled, and thus coerced, prostitute.

79.    Nevertheless, these employees and the Palazzo as a whole continued to welcome Catelyn in to walk the carpet even as late as her final period of active trafficking during 2013–2014.

The Cannery

80.    During 2013–2014, Catelyn walked the carpet inside The Cannery Casino & Hotel and picked up tricks three or four times.

81.    Catelyn had visited The Cannery far more frequently prior to 2012, and she therefore was familiar to its employees and particularly its security staff.

82.    In particular, Catelyn was well known to one Cannery employee who worked as a dealer during the 2013–2014 period.

83.    This employee knew both Catelyn and her trafficker Birdd, and he was fully aware of the abusive and coercive nature of Birdd's control over Catelyn.

84.    Nevertheless, the employee repeatedly assisted the Cannery's guests in patronizing Catelyn, including by bringing potentially lucrative tricks to Catelyn's attention, including on several occasions during 2013–2014.

85.    Between her dress, her frequent visits, her demeanor, and her habit of going upstairs with other guests after only brief conversations, the Cannery's other employees could not have failed to recognize that Catelyn was performing sex work.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

10

86. Because these employees were also, by the nature of their work, reasonably familiar with the sex trade, they would likely have recognized the signs that Catelyn was a pimp-controlled, and thus coerced, prostitute.

87. Nevertheless, the Cannery and its employees continued to welcome Catelyn in to walk the carpet even as late as her final period of active trafficking during 2013–2014.

### Defendants' Attitude toward Sex Trafficking

88. Defendants are loyal heirs to a longstanding tradition of Strip casinos welcoming sex tourism to pad their bottom lines, as described in the introduction at paragraphs ¶¶ 10–24, *supra*.

89. Las Vegas Metropolitan Police Department ("LVMPD") arrest records and public-facing guest reviews of Defendants' properties both make clear that Defendants knowingly and intentionally encourage sex tourism inside their properties.

90. We first consider what LVMPD records can tell us.

91. Prostitution is a crime where it very much "takes two to tango." In theory, then, roughly equal numbers of men and women should be arrested for and charged with soliciting or engaging in prostitution.

92. Indeed, when one considers that most prostitutes are coerced into sex work, one might reasonably hope that more men than women would be charged with soliciting or engaging in prostitution.

93. Sadly, the world is rarely fair to sex workers. In reality, the LVMPD arrests considerably more women than men for soliciting or engaging in prostitution.

94. Specifically, during the seven-year period from the beginning of 2011 through the end of 2017, the LVMPD made 1,053 arrests leading to charges for soliciting/engaging in prostitution inside the primary Zip Code for the Las Vegas Strip, namely Zip Code 89109.

95. Of those 1,053 arrests, 998 were made inside of Strip casinos, and 55 were made somewhere other than inside a Strip casino.

96. Of the 55 arrests made outside of casinos, 20 of the arrestees were male, and 35 were female. Thus, **36% of all non-casino arrestees were male, and 64% were female**.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

97. A female-to-male arrest ratio of almost 2:1 seems unfair—indeed, *is* unfair—for a crime that almost always involves one perpetrator of each gender. But compared to the gender ratio for in-casino prostitution arrests, a gender ratio of 2:1 seems practically utopian.

98. Of the 998 arrests leading to charges for soliciting/engaging in prostitution made inside Strip casinos from 2011 to 2017, 28 of the arrestees were male, and 970 were female. Thus, **2.8% of all in-casino arrestees were male, whereas 97.2% were female**.

99. In other words, during the period when Catelyn was trafficked in Defendants' properties, men who solicited prostitutes inside Strip casinos were over ten times less likely to face prosecution than men who solicited prostitutes on the Strip outside of a casino.

100. This did not happen—and could not have happened—by accident. Instead, it is almost certainly the result of two factors, both of which are fully under the control of the casinos themselves:

    (i) Although casinos regularly report undesirable sex workers and trafficking victims to the LVMPD and assist in their arrests, the same casinos never— or at least very, very rarely—do the same for the many male guests whom they witness soliciting commercial sex; and

    (ii) Casinos discourage the LVMPD officers from arresting male guests on their own initiative using persuasion, cajolery, and threats (whether explicit or implicit) to withhold cooperation with LVMPD stings.

101. In this way, Las Vegas casinos intentionally create an environment where the legal penalties for sex tourism apply exclusively or almost exclusively to the women victimized by it.

102. They do this for the same reason they created "What happens here, stays here"— because they understand that the prospect of consequence-free sex tourism is one of Las Vegas's major draws, particularly for the casinos' prime demographic of older, wealthier men.

103. The relevant properties of two Defendants (MCH's Mirage, and VGLV's Venetian & Palazzo) are located within Zip Code 89109 such that they are covered by the same data described above.

104.    Between 2011 and 2017, there were 65 arrests for soliciting/engaging in prostitution at the Mirage, and there were 83 such arrests at the Palazzo/the Venetian.

105.    Of these, **100% of arrestees at the Mirage were female, and 100% of arrestees at the Palazzo/the Venetian were female**.

106.    Among covered casinos with at least 20 arrests during the period, the Mirage and the Palazzo/the Venetian were the **only** casinos where no males were arrested for soliciting/engaging in prostitution.

107.    In other words, during the time when Catelyn was trafficked inside their properties, MCH and the VGLV provided even more protection from prosecution to their male guests than did the average Strip casino.

108.    Although Boyd's the Cannery is outside of Zip Code 89109 and is therefore not covered by the analyzed data, it is very likely that the Cannery operates in much the same way as the other Strip casinos.  After all, to do otherwise would place it at a considerable disadvantage.

109.    On information and belief, Boyd engages in the conduct detailed in paragraphs ¶¶ 100–102, *supra*, to roughly the same extent as MCH and VGLV.

110.    The sourcing and analysis of the statistics given in paragraphs ¶¶ 94–106 are explained in the document attached hereto as Exhibit 1. A readable summary of the data is attached as Exhibit 2, and the original data as provided by the LVMPD is attached as Exhibit 3.

111.    We now turn to the story told by public-facing guest reviews of Defendants' properties found on Tripadvisor.  Because MCH's the Mirage and VGLV's the Venetian each have over one hundred times more reviews on Tripadvisor than Boyd's the Cannery, this story will perforce also focus on MCH and VGLV.

112.    Guests have long reported that MCH and VGLV's properties are rife with sex work:

(i)    On September 1, 2010, a male guest gave the Mirage five stars, saying there was "[o]nly one negative, I was hit on by a teenage hooker.  I won't say it was a problem, but I did feel uncomfortable.  I guess that's just Las Vegas."

(ii)    On June 1, 2014, a male guest deducted a star from the Mirage because, "[a]t 1:30 AM there were prostitutes everywhere on the casino floor hitting on me."

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

(iii)    On November 8, 2014, a male guest gave the Mirage three stars and explained that it had a "[d]ifferent clientele at night, seemed to be the hangout for prostitutes looking for the next pick up, not what I would expect in this so called high end hotel."

(iv)    On April 10, 2012, a guest gave the Venetian five stars, saying "[t]he only draw back to my stay was seeing hookers coming up the elevator with us…but I guess what they say is true…What happens in Vegas STAYS in Vegas!"

(v)    On February 10, 2013, a guest gave the Venetian four stars, complaining that "when walking back to our suites after enjoying late-night dinner and drinks it was almost impossible not to get propositioned by hookers."

(vi)    On September 17, 2015, a guest gave the Venetian three stars because "[t]his place is infested with prostitutes from late at night to early in the morning.  They're in the casino among the slots and the bar.  They're in the parking garage with their drivers.  They're on the sidewalk and plaza.  Everywhere."

113.    Moreover, guests have reported that MCH and VGLV's employees tolerate open and obvious solicitation for sex work, both in the form of male guests trying to purchase sex and in the form of sex workers trying to sell it:

(i)    On January 24, 2014, a guest gave the Mirage three stars, complaining that "we were very surprised to see . . . a GROUP of prostitutes (they looked the part, but more importantly, the employees verified this and complained about their presence) were there for an extended amount of time on a TUESDAY night."

(ii)    On June 7, 2018, a male guest gave the Mirage three stars in a review entitled "The Mirage casino is full of hookers."  Notably, he explained that "[s]ecurity seems complacent to their presence so I assume they're a hotel courtesy for the whales and convention crowd."

(iii)    On November 15, 2004, a guest gave the Venetian five stars, but complained that "I found the blatant number of prostitutes hanging out every night in the main bar in the casino to be very disappointing.  This really lets down the hotel and why they let it go on, is beyond me.  It's simply uncomfortable to sit at the casino bar on your own for any length of time as you will get approached."

(iv)    On July 4, 2005, a guest gave the Venetian two stars, complaining that "the floor is literally riddled with prostitutes" and that "the bartenders at the central bar on the floor (the circular bar) seemed to be in on the action."

(v)    On January 2, 2012, a female guest gave the Venetian two stars, saying "If you look too nice, you will be mistaken for a hooker.  Guys think its acceptable to approach ladies and whisper 'cash' in their ear.  This happened three times. . . . Its never happened anywhere else and I travel frequently.  I complained to a restaurant hostess and she said it was unacceptable and to ignore them. . . . the hotel should discourage male guests solicit prostitution from female patrons."

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

14

(vi) On May 11, 2012, a guest gave the Venetian four stars, having deducted a star because "[m]y husband has been propositioned by prostitutes the last 2 times we have stayed at the Venetian . . . these pros were very easy to spot and kept going up man to man throughout the casino. I wish security would address this issue. It is quite obvious."

(vii) On April 23, 2014, a guest gave the Venetian four stars, saying, "[t]his is a 5 star resort and prostitutes were plentiful at the casino. Security seemed to tolerate them. I was accosted to many times to count while sitting at the slot machines. I'm open minded, but it was excessive."

(viii) On October 9, 2015, a guest gave the Venetian four stars in a review entitled "Beautiful rooms but too many prostitutes." He explained that he disliked "not being able to go down to the coffee shops in the morning without being solicited by prostitutes several times . . . It also surprised me with how friendly the staff were with the prostitutes, which let me know that the hotel knew they were there."

(ix) On June 30, 2022, a guest gave the Venetian one star in a review entitled "Prostitutes Everywhere and welcome by staff." The reviewer explained, "Beware!!!! This casino is a HUGE hotspot for prostitution. . . . They are throwing themselves at any men and the casino staff is watching it all go down—I'm talking SECURITY, bar tenders, floor MANAGERS, waitresses and cashiers. The prostitutes are so COMFORTABLE there and NONE of the staff ask them to leave. At one point I had to escort my husband to the bathroom so these prostitutes wouldn't approach him.

One of the prostitutes standing at the bathroom had her full breast exposed and hanging out of her blouse." The guest explained that she even told a cashier, "There are so many prostitutes here and its disgusting," but the cashier just said "oh yea, I know." And when the guest approached security and pointed the prostitutes out, "the security guard just shook her head and went back to pacing the aisles with the other security guards watching it all go down."

114. Indeed, VGLV employees even apparently helped advertise and facilitate commercial sex:

(i) On October 16, 2011, a guest gave the Venetian four stars, complaining that when they arrived in their freshly cleaned room, "there were business cards for prostitutes stuck in the mirror."

(ii) On September 14, 2015, a guest gave the Venetian five stars, saying "While I was walking through the hotel . . . I received as many as 5-7 prostitutes hitting on me. So as a joke when went up to the room we called the front desk and asked if they could send up some hookers. They were more than happy to help us. We said no thank you and hung up laughing." The Venetian's Hotel Manager – Guest Relations responded to this review with an apology for the unwanted propositions, but he neither apologized for nor attempted to investigate the front desk personnel who offered to "send up some hookers."

115. And if VGLV and MCH listen to their customers, they can hardly deny knowing that the presence of commercial sex workers attracts certain customers. For instance:

(i)    On September 22, 2014, a male guest gave the Mirage five stars and called it the "best place I ever stayed in," before explaining that he had "spent too much money . . . even bought art work and three hookers too."

(ii)    On March 10, 2022, a guest gave the Venetian four stars, saying, "I noticed many prostitutes hanging out in the Venetian slot machine area late at night. Depending on who you are, that may be a desirable thing (or not) but . . . it is Sin City after all." Interestingly, someone from the Venetian's Guest Relations responded, "I am so glad to learn of your memorable experience. We pride ourselves on the exceptional service and amenities we deliver to our guests, and it sounds like we succeeded!"

116. Of course, despite the abundance of customer reviews putting the VGLV on notice of rampant commercial sex on its premises—and despite the fact that VGLV engineered this situation of its own accord—the Venetian's VP of Hotel Operations was "shocked" (shocked, I tell you!) to see the relatively tame April 5, 2014 review from a guest who reported "the place was openly crawling with prostitutes," and complained of being "approached by some of these ladies."

117. On information and belief, numerous Boyd employees also saw and tolerated open solicitation for commercial sex to a similar extent as VGLV and MCH's employees did.

<u>Defendants' Surveillance</u>

118. At all relevant times, VGLV, Boyd, and MCH used sophisticated facial recognition software, with which they monitored their properties' omnipresent security cameras, particularly at casino entrances.

119. Las Vegas casinos, including those of Defendants, have long been at the cutting edge of surveillance technology. As one scholar has explained, "With increased competition comes the technocratic race to modernize facilities, generate revenue, and minimize losses. Thus, it was only a matter of time before casinos employed some of the most elaborate surveillance and security systems in the world." Gabel, Jessica, *CSI Las Vegas: Privacy, Policing, and Profiteering in Casino Structured Intelligence*, UNLV GAMING LAW JOURNAL, Vol. 3:39, at 40 (Spring 2012).

120. One major purpose of Defendants' facial recognition software was to assist their security staff in turning away persons Defendants considered undesirable.

121. It did this by flagging such persons wherever they were spotted in the casinos and alerting security personnel.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

122.   One major use of this surveillance system and its facial recognition software, from the perspective of Defendants, was (and still is) to single out and exclude unruly, unattractive, or otherwise undesirable prostitutes while still allowing those their security staff deems sufficiently demure and attractive to ply their trade on the casinos' gaming floors.

123.   By doing so, Defendants knowingly and intentionally create a glamorous atmosphere and a curated commercial sex tourism experience to attract high rollers.

124.   Defendants' efforts to attract high rollers using commercial sex were (and remain) largely successful, resulting in greatly increased gambling, room rental, shopping, and food and drink revenues for Defendants as compared to the counterfactual where they expel all known prostitutes and trafficking victims, let alone the counterfactual where they also expel guests known to have solicited prostitutes or trafficking victims on their premises.

125.   On information and belief, Defendants' facial recognition software was able to (and did) recognize and flag Catelyn as a suspiciously frequent visitor to each casino.

126.   On information and belief, Defendants' security employees ignored the flag on Catelyn because they understood Defendants' policy that only undesirable or disruptive sex workers should be singled out, and then only to be turned away or ejected.

127.   On information and belief, security personnel at each casino became aware on multiple occasions that Catelyn was visiting (or had just visited) their casino for the purpose of engaging in commercial sex.

128.   Additionally, because Defendants' security employees were perforce more familiar with the sex industry than an average member of the public, they would have been aware that many, or even most, prostitutes are underage or are victims of coercion.

129.   Thus, on information and belief, the employees knew Catelyn was being trafficked.

130.   Nevertheless, the employees turned a blind eye to Catelyn's plight because to do otherwise would have inconvenienced the employees and potentially upset her clients (and the casinos' guests) who often came to Las Vegas for its reputation for tolerating commercial sex.

131.   On information and belief, this willful blindness was intentionally fostered by Defendants in order to please their clientele and to pad their bottom lines.

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

132. Additionally, this willful blindness was likely encouraged by Defendants' desire to draw a sharp line between acceptable "consensual prostitution" and human trafficking in a way that places nearly all prostitutes on the "consensual" side of the line.

133. On information and belief, to the extent that Defendants gave their employees any training on recognizing human trafficking, that training strongly emphasized the idea that most prostitution is consensual, and thus that employees should only take action (or report to their superiors) if they witnessed clear direct evidence of severe physical abuse.

### CATELYN'S ONGOING SUFFERING

134. After she escaped, Catelyn couldn't believe that anyone would take a story like hers seriously, let alone that she could have a chance at justice.

135. This mental block was built and strengthened by her experiences, including her decade of abuse at Birdd's hands and the words of other girls she met in "the game," all of which had taught her that no one cared what happened to sex workers.

136. Catelyn's traffickers intentionally fostered Catelyn's belief that even women like her who had been forced into sex work as children were undeserving of justice—and that nobody would ever take them seriously.

137. Defendants also created a climate in the Las Vegas area of disregarding and trivializing the suffering of sex workers, in particular by consistently characterizing sex workers as criminals and themselves as the real victims.

138. Even had Catelyn been able to see herself as a victim worthy of justice, her interrupted education and the grinding poverty to which she found herself reduced after her escape would have made it nearly impossible for her to find assistance in pursuing justice on her own.

139. It wasn't late 2023 that Catelyn saw the advertisement that broke through and let her conceptualize herself as a victim so that she was finally able to bring herself to speak to an attorney about what had happened to her.

//

//

//

THE702FIRM
ATTORNEYS AT LAW
8335 West Flamingo Road
LAS VEGAS, NEVADA 89147
PHONE: (702) 776-3333

18

## COUNT I: 18 U.S.C. § 1595 ("TVPRA")

140.  Plaintiff incorporates each foregoing and subsequent allegation.

141.  Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

142.  Through their acts and omissions described above, Defendants are "perpetrator[s]" of Plaintiff's sex trafficking within the meaning of 18 U.S.C. § 1591(a)(1 & 2), as they harbored her while being reckless with regard to a substantial risk that she was being trafficked (and in some cases was also underage).

143.  Through their acts and omissions described above, Defendants subject to liability as beneficiaries of trafficking under 18 U.S.C. § 1595.  Each Defendant participated in a commercial venture, such as the running of a hotel, motel, or casino, and each Defendant was negligent and reckless with regard to whether the venture benefitted from Plaintiff's trafficking.

144.  Plaintiff has suffered substantial permanent physical and psychological injuries as the result of being trafficked and sexually exploited, and she is therefore entitled to bring an action against each Defendant for damages under 18 U.S.C. § 1595.

## COUNT II: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

145.  Plaintiff incorporates each foregoing and subsequent allegation.

146.  Defendants' intentional acts and omissions, as described above, were extreme and outrageous to the point of being intolerable in a civilized society.

147.  Plaintiff suffered severe emotional distress and permanent psychological injuries as a result of Defendants' intentional acts and omissions, and she is therefore entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.  Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; and all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits and/or restitution;

c.  Punitive damages, attorneys' fees, and expenses;

**d.** The costs of this action;

**e.** Pre- and post-judgment interest; and

**f.** Any other relief the Court or jury deems appropriate.

DATED this 11th day of July, 2024.

/s/ *Geoffrey C. Parker*

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice*)
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
THE702FIRM INJURY ATTORNEYS
400 South 7th Street, Suite 400
Las Vegas, Nevada  89101

*Attorneys for Plaintiff Catelyn H.*

## DEMAND FOR JURY TRIAL

Plaintiff Catelyn H., by and through her attorneys of record, hereby demands a jury trial of all issues in the above matter.

DATED this 11th day of July, 2024.

/s/ *Geoffrey C. Parker*

GEOFFREY C. PARKER, ESQ.
(*Pro Hac Vice*)
HILTON PARKER LLC
Ohio Bar No. 0096049
7658 Slate Ridge Boulevard
Reynoldsburg, Ohio 43068

MICHAEL C. KANE, ESQ.
Nevada Bar No. 10096
BRADLEY J. MYERS, ESQ.
Nevada Bar No. 8857
JOEL S. HENGSTLER, ESQ.
Nevada Bar No. 11597
THE702FIRM INJURY ATTORNEYS
400 South 7th Street, Suite 400
Las Vegas, Nevada  89101

*Attorneys for Plaintiff Catelyn H.*